## UNITED STATES DISTRICT COURT FOR
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Henley Management Company, Big Bear Properties, Inc., Northbrook Properties, Inc., RCK Properties, Inc., Kitchens, Inc., Aberfeldy LP, and Payroll and Insurance Group, Inc. | ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| Marsh Inc., Marsh USA Inc., The Chubb Corp., Federal Insurance Co., Fireman's Fund Insurance Co., Zurich American Insurance Co., Great American Insurance Co., Liberty Mutual Insurance Co., American Guarantee and Liability Insurance Co., American International Group, Inc., National Union Fire Insurance Co. of Pittsburgh, St. Paul Travelers Co., Inc., St. Paul Guardian Insurance Co., St. Paul Mercury Insurance Co., St. Paul Fire and Marine Insurance Co., Travelers Property Casualty Co. of America f/k/a Travelers Indemnity Insurance Co. of Illinois, The Travelers Indemnity Co. f/k/a Gulf Insurance Co., Fidelity and Guaranty Insurance Co., ACE USA, Inc., Royal and SunAlliance Insurance Group plc, Arrowpoint Capital Corp. f/k/a Royal Indemnity Co. f/k/a Royal Lloyd's of Texas and Royal Insurance Co. of America, CNA Financial Corp., The Continental Insurance Company f/k/a The Fidelity and Casualty Company of New York, Valley Forge Insurance Company, Continental Casualty Company, Transcontinental Insurance Company, American Bankers Insurance Group, Inc., AXA Art Insurance Corp., Commonwealth Insurance Co., The Hartford Financial Services Group, Inc., Affiliated FM, Arch Insurance Co., Kemper Auto and Home Group, Inc., and XL Winterthur International, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Henley Management Company ("Henley Management"), Big Bear Properties, Inc. ("Big Bear Properties"), Northbrook Properties, Inc. ("Northbrook Properties"), RCK Properties, Inc. ("RCK Properties"), Kitchens, Inc. and Aberfeldy LP (collectively, "Kitchens, Inc."), and Payroll and Insurance Group, Inc. ("Payroll and Insurance Group") (all collectively, "Plaintiffs"), by their attorneys, bring this complaint against Marsh Inc. and Marsh USA Inc. (collectively, "Marsh"), and The Chubb Corp. and Federal Insurance Co. (collectively, "Chubb"), Fireman's Fund Insurance Co. ("Fireman's Fund"), Zurich American Insurance Co. ("Zurich"), Great American Insurance Co. ("Great American"), Liberty Mutual Insurance Co. ("Liberty Mutual"), American Guarantee and Liability Insurance Co. ("American Guarantee"), American International Group Inc. and National Union Fire Insurance Co. of Pittsburgh (collectively, "AIG"), St. Paul Travelers Co., Inc., St. Paul Guardian Insurance Co., St. Paul Mercury Insurance Co., St. Paul Fire and Marine Insurance Co., Travelers Property Casualty Co. of America f/k/a Travelers Indemnity Insurance Co. of Illinois, The Travelers Indemnity Co. f/k/a Gulf Insurance Co., and Fidelity and Guaranty Insurance Co. (collectively, "St. Paul Travelers"), ACE USA, Inc. ("ACE"), Royal and SunAlliance Insurance Group plc, Arrowpoint Capital Corp., and Royal Indemnity Co. f/k/a Royal Lloyd's of Texas and Royal Insurance Co. of America (collectively, "Royal and SunAlliance"), CNA Financial Corp., The Continental Insurance Company f/k/a The Fidelity and Casualty Company of New York, Continental Casualty Company, Valley Forge Insurance Company, and Transcontinental Insurance Company (collectively, "CNA"), American Bankers Insurance Group, Inc. ("American Bankers"), AXA Art Insurance Corp. ("AXA"), Commonwealth Insurance Co. ("Commonwealth"), The Hartford Financial Services Group, Inc. ("Hartford"), Affiliated FM, Arch Insurance Co. ("Arch"), Kemper Auto and Home Group, Inc. ("Kemper"), and XL Winterthur International ("XL Winterthur") (all collectively, "Insurer Defendants") for a trial by jury and state as follows:

# PARTIES

## Plaintiffs

1.      Henley Management Company ("Henley Management") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Illinois.

2.      Big Bear Properties, Inc. ("Big Bear Properties") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Illinois.

3.      Northbrook Properties, Inc. ("Northbrook Properties") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois.

4.      RCK Properties, Inc. ("RCK Properties") is a corporation organized and existing under the laws of the State of Colorado, with its principal place of business in Illinois.

5.      Kitchens, Inc. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Texas.  Aberfeldy LP is a limited partnership with its principal place of business in Texas.  Because Kitchens, Inc. is the general partner of Aberfeldy LP, the companies will collectively be referred to as "Kitchens, Inc."

6.      Payroll and Insurance Group, Inc. ("Payroll and Insurance Group") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Illinois.

## Broker Defendants

7.      At all relevant times herein, Marsh Inc. and Marsh USA Inc. (collectively, "Marsh") dealt with Plaintiffs together as related accounts through the New York and California offices.

8.      Marsh Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036.  Marsh Inc.'s Global Broking department in New York originated, planned, and implemented the wrongful acts described in this Complaint.

9. Marsh USA Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 1166 Avenue of the Americas, New York, NY 10036. Marsh USA Inc. entered into the agreements with Plaintiffs to provide insurance brokerage services.

**Insurer Defendants**

10. The Chubb Corp. ("Chubb") is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business at 15 Mountain View Road, Warren, NJ 07059. Federal Insurance Co. is a subsidiary of Chubb and is a corporation organized and existing under the laws of the State of Indiana, with its principal place of business at 251 North Illinois, Suite 1100, Indianapolis, IN 46204. Chubb, acting by itself or through its subsidiary, provided excess casualty insurance to Kitchens, Inc., RCK Properties, Big Bear Properties, and Henley Management, provided homeowner's insurance to Northbrook Properties, and provided crime insurance to Henley Management.

11. Fireman's Fund Insurance Co. ("Fireman's Fund") is a corporation organized and existing under the laws of the State of California, with its principal place of business at 777 San Marin Drive, Novato, CA 94998. Fireman's Fund provided excess casualty insurance to Henley Management, RCK Properties, and Kitchens, Inc., as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

12. Zurich American Insurance Co. ("Zurich") is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 1400 American Lane, Schaumburg, IL 60196. Zurich provided excess casualty insurance to Kitchens, Inc., RCK Properties, Big Bear Properties, Henley Management, and Payroll and Insurance Group, as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

13. Great American Insurance Co. ("Great American") is a corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 580 Walnut Street, Cincinnati, OH 45202. Great American provided excess casualty insurance to Henley

Management, as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

14. Liberty Mutual Insurance Co. ("Liberty Mutual") is a corporation organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business at 175 Berkeley Street, Boston, MA 02116. Liberty Mutual provided excess casualty insurance to Henley Management and Big Bear Properties, as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

15. American Guarantee and Liability Insurance Co. ("American Guarantee") is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 1400 American Lane, Schaumburg, IL 60196. American Guarantee provided excess casualty insurance to Henley Management and Big Bear Properties.

16. American International Group, Inc. ("AIG") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 70 Pine Street, New York, NY 10028. National Union Fire Insurance Company is a subsidiary of AIG and is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 70 Pine Street, New York, NY 10028. AIG, acting by itself or through its subsidiary, provided excess casualty insurance to Kitchens, Inc., as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

17. St. Paul Travelers Co., Inc. ("St. Paul Travelers") is a corporation organized and existing under the laws of the State of Minnesota, with its principal place of business at 385 Washington Street, St. Paul, MN 55102. St. Paul Guardian Insurance Co., St. Paul Mercury Insurance Co., and St. Paul Fire and Marine Insurance Co. are all subsidiaries of St. Paul Travelers and are also corporations organized and existing under the laws of the State of Minnesota with their principal place of business 385 Washington Street, St. Paul, MN 55102. Travelers Property Casualty Co. of America (f/k/a Travelers Indemnity Insurance Co. of Illinois) and The Travelers Indemnity Co. (f/k/a Gulf Insurance Co.) are also subsidiaries of St. Paul

Travelers, and are corporations organized and existing under the laws of the State of
Connecticut, with their principal place of business at One Tower Square, Hartford, CT 06183.
Fidelity and Guaranty Insurance Co. is also a subsidiary of St. Paul Travelers, and is a
corporation organized and existing under the laws of the State of Iowa, with its principal place of
business at 385 Washington Street, St. Paul, MN 55102. St. Paul Travelers, acting by itself or
through its subsidiaries, provided excess casualty insurance to Kitchens, Inc. and RCK
Properties, provided general and auto liability insurance to Big Bear Properties, Henley
Management, Kitchens, Inc, RCK Properties and Payroll and Insurance Group, provided foreign
g/l insurance to Henley Management and Payroll and Insurance Group, provided crime insurance
to Kitchens, Inc., Big Bear Properties, and Henley Management, and provided machinery
insurance to Kitchens, Inc., as well as provided fictitious and artificially inflated "B quotes" to
Plaintiffs at the request of Marsh.

18.    ACE USA, Inc. ("ACE") is a corporation organized and existing under the laws
of the State of Delaware, with its principal place of business at 436 Walnut Street, Philadelphia,
PA 19106-3703. ACE provided foreign g/l insurance to Kitchens, Inc. and Henley Management,
as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of
Marsh.

19.    Royal and SunAlliance Insurance Group plc ("Royal and SunAlliance") is a
corporation organized and existing under the laws of the United Kingdom, with its principal
place of business at 9th Floor, One Plantation Place, 30 Fenchurch Street, London, EC3M 3BD,
England. Royal Indemnity Co. (f/k/a Royal Lloyd's of Texas and Royal Insurance Co. of
America) is a corporation organized and existing under the laws of the State of Delaware, with
its principal place of business at 3600 Arco Corporate Drive, Charlotte, NC 28201. Arrowpoint
Capital Corp. is a corporation organized and existing under the laws of the State of Delaware,
with its principal place of business at 3600 Arco Corporate Drive, Charlotte, NC 28201.
Arrowpoint Capital recently purchased the Royal and SunAlliance's ownership of Royal
Indemnity Co. and its affiliates. Before its sale to Arrowpoint Capital, Royal and SunAlliance,

by itself or through its subsidiaries, provided auto liability, excess casualty, general liability, machinery, and terrorism insurance to Kitchens, Inc., as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

20.     CNA Financial Corp. ("CNA") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 333 S. Wabash Avenue, Chicago, IL 60604.  The Continental Insurance Company (f/k/a The Fidelity and Casualty Company of New York) and Valley Forge Insurance Company are subsidiaries of CNA and are corporations organized and existing under the laws of the State of Pennsylvania, with their principal place of business at 333 S. Wabash Avenue, Chicago, IL 60604.  Continental Casualty Company is also a subsidiary of CNA and is a corporation organized and existing under the law of the State of Illinois, with its principal place of business at 333 S. Wabash Avenue, Chicago, IL 60604.  Transcontinental Insurance Company is another subsidiary of CNA and is a corporation organized and existing under the laws of the State of New York with its principal place of business at 333 S. Wabash Avenue, Chicago, IL 60604.  CNA, by itself or through its subsidiaries, provided foreign g/l insurance to Henley Management and Kitchens, Inc., boiler and machinery insurance to Henley Management, and auto and general liability insurance to Kitchens, Inc, as well as provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

21.     American Bankers Insurance Group, Inc. ("American Bankers") is a corporation organized and existing under the laws of the State of Florida, with its principal place of business at 11222 Quail Roost Drive, Miami FL 33157.  American Bankers provided flood insurance to Northbrook Properties.

22.     AXA Art Insurance Corp. ("AXA") is a corporation organized and existing under the laws of the State of New York, with its principal place of business at 4 W. 58th Street, New York, NY 10019.  AXA provided Fine Arts insurance to Northbrook properties.

23.     Commonwealth Insurance Co. ("Commonwealth") is a corporation organized and existing under the laws of Canada, with its principal place of business at 595 Burrard Street,

Vancouver, BC V7X 1G4.  Commonwealth provided property, boiler and machinery, and terrorism insurance to Henley Management.

24.     The Hartford Financial Services Group, Inc. ("Hartford") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at Hartford Plaza, Hartford, CT 06115.  Hartford provided boiler and machinery insurance to Henley Management.

25.     Affiliated FM is a corporation organized and existing under the laws of the State of Rhode Island, with its principal place of business at 1301 Atwood Avenue, Johnston, RI 02919.  Affiliated FM provided machinery and terrorism insurance to Kitchens, Inc.

26.     Arch Insurance Co. ("Arch") is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business at One Liberty Plaza, 53rd Floor, New York, NY 10006.  Arch provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

27.     Kemper Auto and Home Group ("Kemper") is a corporation organized and existing under the laws of the State of Illinois, with its principal place of business at 5210 Belfort Road, Suite 120, Jacksonville, FL 32256.  Kemper provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

28.     XL Winterthur International ("XL Winterthur") is a corporation organized and existing under the laws of Bermuda, with its principal place of business at XL House, One Bermudiana Road, Hamilton, Bermuda  HM 11, Bermuda.  XL Winterthur provided fictitious and artificially inflated "B quotes" to Plaintiffs at the request of Marsh.

## JURISDICTION AND VENUE

29.     Because the civil action arises under the Sherman Act, 15 U.S.C. § 1, this Court has subject matter jurisdiction pursuant to section 4 of the Clayton Act, 15 U.S.C. § 5, and 28 U.S.C. §§ 1331 and 1337.  This Court has subject matter jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367.

30.     Marsh Inc., Marsh USA Inc., Chubb, Fireman's Fund, Zurich, Great American, Liberty Mutual, American Guarantee, AIG, St. Paul Travelers, ACE, Royal and SunAlliance, CNA, American Bankers, AXA, Commonwealth, Hartford, Affiliated FM, Arch, Kemper, and XL Winterthur are subject to personal jurisdiction in this district because they engage in systematic and regular business in this district and because this is a claim related to litigation pending in this district in *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663.

31.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Marsh Inc., Marsh USA Inc., Chubb, Fireman's Fund, Zurich, Great American, Liberty Mutual, American Guarantee, AIG, St. Paul Travelers, ACE, Royal and SunAlliance, CNA, American Bankers, AXA, Commonwealth, Hartford, Affiliated FM, Arch, Kemper, and XL Winterthur are subject to personal jurisdiction in this district and because this is a claim related to litigation pending in this district in *In re Insurance Brokerage Antitrust Litigation*, MDL No. 1663.

## SUMMARY OF CLAIMS

32.     This is an action for treble damages and attorneys' fees under the Sherman Act and forfeiture of compensation under state law.  Beginning as early as 1998 and continuing through 2005, Marsh received compensation for serving as Plaintiffs' insurance broker. Plaintiffs paid millions of dollars in insurance premiums for insurance policies to Chubb, Fireman's Fund, Zurich, Great American, Liberty Mutual, American Guarantee, AIG, St. Paul Travelers, ACE, Royal and SunAlliance, American Bankers, AXA, CNA, Commonwealth, Hartford, and Affiliated FM placed by Marsh during this period.  Marsh promised Plaintiffs during this period that it would act in the best interests of Plaintiffs to obtain cost-effective insurance but failed to do so.

33.     Through the actions of its Global Broking department in New York, Marsh supervised bid rigging of excess casualty, general liability, auto liability, property, boiler and machinery, flood, homeowner's, crime, foreign g/l, fine arts and terrorism insurance policies by coordinating with the Insurer Defendants.  The bid rigging supervised by Marsh harmed

Plaintiffs as consumers of insurance. As Marsh knew, the direct effect of the bid rigging was to inflate the price that consumers of excess casualty coverage paid for insurance.

34.    Contemporaneous business records show clearly the illegal actions described in this complaint. The business records expose the illegal actions and their purpose and effect. As the records show, Marsh orchestrated a bid rigging scheme in order to enhance its profits and to insulate the Insurer Defendants from price competition.

35.    As a result of its bad faith conduct, Marsh should return the compensation it kept for serving as a broker on behalf of Plaintiffs. Marsh and the Insurer Defendants should also be held accountable for the damages caused by the bid rigging.

**FACTS**

**Plaintiffs' Relation with Marsh**

36.    Marsh served as Plaintiffs' insurance broker for many years. As Plaintiffs' insurance broker, Marsh claimed to act in Plaintiffs' best interest for the express purpose of purchasing cost-effective insurance.

37.    Plaintiffs entered into client service agreements with Marsh with the understanding that Marsh had a responsibility to provide services and advice for the benefit of Plaintiffs, including finding the most favorable insurance coverage available. For example, in a June 2, 2003 engagement letter to Kitchens, Inc., Marsh committed to "use its best efforts to place insurance on your behalf, if so instructed by you." (Exhibit 1.)

38.    Pursuant to the client service agreements, Marsh agreed to represent Plaintiffs and not the insurance companies. Marsh further agreed that it would negotiate on Plaintiffs' behalf with the insurance companies and keep Plaintiffs informed of any significant developments.

39.    Marsh improperly steered business and unlawfully rigged bids and fixed prices through the help of Chubb, AIG, Zurich, Liberty Mutual, Great American, Fireman's Fund, and St. Paul Travelers (d/b/a Gulf Insurance Co.), as well as the other Insurer Defendants, in order to maximize the amount of these contingent commissions it would receive from insurers.

**Bid Rigging**

40.     Marsh has coordinated an unlawful bid rigging scheme with the Insurer Defendants for the provision of excess casualty, general liability, auto liability, property, boiler and machinery, flood, homeowner's, crime, foreign g/l, fine arts, and terrorism policies to Plaintiffs.  With respect to excess casualty insurance, current and former Marsh employees have already admitted such bid rigging in pleas with the State of New York.

41.     Excess casualty insurance accounts for a significant portion of the insurance premiums that Plaintiffs paid to insurance companies during the period covered by this Complaint.  Companies purchase excess casualty insurance to protect themselves from large liability claims by third parties that exceed the limits of their primary liability insurance.  It is necessary for companies such as Plaintiffs to purchase excess casualty insurance in order to control the risks to their business from large liability claims.

42.     For example, for the time period December 31, 2001 to December 30, 2002, Marsh had a program in place that established the price that Plaintiffs paid for excess casualty insurance.  Plaintiffs Kitchens, Inc., RCK Properties, Big Bear Properties, and Henley Management, all purchased their lead layer of excess casualty insurance from Chubb during that period.  Plaintiffs also purchased additional layers of excess casualty insurance from many of the other Insurer Defendants.

43.     In the fall of 2001, Plaintiffs met with and held discussions with Marsh concerning Plaintiffs' renewal of excess casualty insurance effective after December 30, 2001.  Plaintiffs explained to Marsh during these discussions that they wanted Marsh to act as their representative in seeking competitively priced insurance.  Plaintiffs told Marsh that Plaintiffs expected Marsh to solicit several competitive quotes from various insurance carriers, in addition to the incumbent carrier, Chubb, for the purchase of excess casualty insurance.

44.     Because of the importance of the excess insurance policies that they sought to purchase, Plaintiffs told Marsh to disclose all bid submissions from the carriers solicited by Marsh.

45.     Marsh understood what Plaintiffs expected of them.  In an internal communication, Marsh recognized that Plaintiffs asked Marsh that the "renewal program be marketed to as many carriers that would be interested in quoting this account."  The internal communication continued on, stating that Plaintiffs "will be looking to receive copies of the carriers emails or faxes that you receive **DIRECTLY FROM THE CARRIER** that either state the carrier declining to quote or what the high pricing indication is that is provided and unacceptable to Marsh."  (Emphasis in original.)  (Exhibit 2.)

46.     In response to Plaintiffs' request, Marsh misrepresented to Plaintiffs that it would seek competitive bids to meet Plaintiffs' need for competitively priced insurance.

47.     Since 2001 or earlier, Marsh and Chubb, along with other carriers, including the other Insurer Defendants, agreed to rig the bids that the carriers made for excess casualty insurance coverage in the United States.  Specifically, the Insurer Defendants agreed with Marsh that they would each submit fake bids (sometimes referred to as "B Quotes") to guarantee that the incumbent insurance carrier would retain the business of a particular customer seeking to purchase excess casualty insurance.  Marsh implemented this bid rigging agreement among the carriers because it resulted in the payment of substantial contingent commissions to Marsh.

48.     Instead of acting on Plaintiffs' demands to obtain competitive bids, Marsh managers, including Todd Murphy, Mark Manzi, Kathy Drake, and Joshua Bewlay in Marsh's Global Broking Excess Casualty department in New York and Barbara Llewellyn in Marsh's Los Angeles office, orchestrated and implemented the issuance of fictitious and artificially inflated "B quotes" from the Insurer Defendants, including AIG, Liberty Mutual, Zurich, Great American, St. Paul Travelers (d/b/a Gulf Insurance Co.), and Fireman's Fund for the lead layer in Plaintiffs' excess casualty insurance programs.  Marsh's intention was for Chubb, the incumbent carrier on the lead excess layers, to retain the business while providing the illusion of competitive bidding in order to satisfy Plaintiffs' demands.

49.     Marsh managers directed carriers to prepare and submit false records consisting of inflated and fictitious bids so that Marsh could then pass these fictitious bids along to

Plaintiffs. In its internal communications, Marsh stated that "[w]e will offer the renewal to the incumbent carriers and need type B alternatives from the remaining carriers." (Exhibit 3.)

50. Knowing that Marsh would prevent the submission of any competitive bids, Chubb submitted an artificially raised bid with a significantly higher premium than the year before, fully confident that it would retain the lead excess layers on Plaintiffs' accounts. The other insurer defendants submitted fictitious "B Quotes" with the understanding that Marsh would reward them, either through new business or retaining the policies to which they served as the incumbent.

51. Relying on Marsh's misrepresentations about the bids received, Plaintiffs instructed Marsh in December 2001 to accept the Chubb bid. Chubb served as Plaintiffs' lead excess casualty insurer during 2002.

52. A year later, in the fall of 2002, when Plaintiffs' excess casualty insurance policies were expiring, Plaintiffs again met and held discussions with Marsh to seek renewals of these policies effective after December 30, 2002. Just as Plaintiffs did the year prior, Plaintiffs told Marsh that they expected Marsh to solicit several competitive quotes from various insurance carriers in addition to Chubb for the purchase of excess casualty insurance. Plaintiffs again told Marsh to disclose all bid submissions from carriers solicited by Marsh.

53. Again, Marsh understood what Plaintiffs expected of them. In an internal communication, Marsh recognized that Plaintiffs asked Marsh that the "renewal program be marketed to as many carriers that would be interested in quoting this account." (Exhibit 4.) Another Marsh manager wrote that "the client is extremely concerned about a full-blown marketing effort." (Exhibit 5.)

54. However, in response to Plaintiffs' request, Marsh again misrepresented to Plaintiffs that it would seek competitive bids to meet Plaintiffs' need for competitively priced insurance. Internal communications show that Marsh planned to secure renewal of Chubb as the lead excess casualty insurer for Plaintiffs RCK Properties, Big Bear Properties, and Kitchens, Inc. For each Plaintiff, Joshua Bewlay directed Marsh's Global Broking employees to obtain

"FORMAL indications from carriers too regarding any pricing indications for B quotes."
(Exhibit 6.)

55.     The following year, during the process of renewing Plaintiffs' excess insurance
policies commencing on December 31, 2003, a company that was an affiliate of Plaintiffs
became dissatisfied with Marsh's performance and decided to hire a different broker in addition
to Marsh to solicit bids on Plaintiffs' behalf.  The local broker obtained quotes from CNA, Gulf,
Chubb, and Fireman's Fund that were significantly lower than the bids disclosed by Marsh.

56.     Upon learning of the carriers' bid submissions to the new broker, Marsh sought
retaliation on those carriers by excluding them from the Henley Management, RCK Properties,
Kitchens, Inc., Big Bear Properties, and Payroll and Insurance Group's excess casualty renewals.
In an email dated December 24, 2003, Edward Keane, under directions from Joshua Bewlay,
ordered Marsh brokers to "[p]lease go to CNA, GULF, CHUBB & FIREMAN'S FUND and try
to block the market for these accounts.  Hopefully it [sic] not too late and please let me know if
they have been approached by another broker."  (Exhibit 7.)  Far from representing Plaintiffs'
best interests, Marsh misused its position to punish those carriers that submitted lower priced
bids, thereby cutting into revenues Marsh stood to gain from contingent commissions it would
receive from insurers.

57.     The bid rigging that Marsh instigated from 2001 through 2003 concerned the lead
layer of excess casualty insurance purchased by Plaintiffs.  As Marsh and the carriers fully
understood, an increase in the price charged by the lead excess casualty insurer resulted in an
increase in the price of additional layers of excess casualty insurance.  Therefore, Marsh's bid
rigging caused Plaintiffs to pay an inflated amount in excess casualty premiums on lead layers
and other layers from 2002 through 2004.

58.     In plea agreements with the State of New York, current or former employees of
Marsh admitted that they agreed to rig bids in a scheme Marsh coordinated.  This includes the
plea agreements of Joshua Bewlay and Mark Manzi, both former Managing Directors of Marsh's
Global Broking department, and Robert Stearns and Todd Murphy, both former Marsh Senior

Vice Presidents.  All of these Marsh employees were involved in offering brokerage services to Plaintiffs through Marsh's Global Broking department in New York.  Former Managing Director of Marsh's Global Broking department, Kathryn Winter, also agreed to a plea agreement.

59.     The bid rigging coordinated by Marsh caused harm to Plaintiffs in connection with the transactions described above.  Upon information and belief, the bid rigging caused harm to Plaintiffs on additional transactions.  These transactions include the artificially high prices that Plaintiffs paid in their purchases of excess casualty insurance from Chubb, Fireman's Fund, Great American, American Guarantee, AIG, Royal and SunAlliance, Liberty Mutual, Zurich, and St. Paul Travelers from 1999 through 2005.

60.     Upon information and belief, the bid rigging coordinated by Marsh with the participation of the Insurer Defendants also caused harm to Plaintiffs in their purchases of homeowner's and crime insurance from Chubb, purchases of general and auto liability, foreign g/l, crime, and machinery insurance from St. Paul Travelers, purchases of foreign g/l insurance from ACE, purchases of general liability, machinery, and terrorism insurance from Royal and SunAlliance, purchases of flood insurance from American Bankers, purchases of Fine Arts insurance from AXA, purchases of foreign g/l, boiler and machinery, auto, and general liability insurance from CNA, purchases of property, boiler and machinery, and terrorism insurance from Commonwealth, purchases of boiler and machinery insurance from Hartford, and purchases of machinery and terrorism insurance from Affiliated FM.

## CLAIMS AGAINST DEFENDANTS

### Count 1: Per Se Illegal Violation of Sherman Act § 1 (All Defendants)

61.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

62.     The activities of Marsh and the Insurer Defendants that participated in the bid rigging scheme as described in this Complaint are within the flow of, and substantially affected, interstate commerce.

63.     Marsh, in agreement with the Insurer Defendants, orchestrated and supervised a scheme among competing Insurer Defendants to engage in bid rigging.  The scheme included the agreement to fix the price that Plaintiffs paid for insurance coverage by rigging the bids that Chubb and other carriers submitted to Plaintiffs.  The bid rigging agreement is a per se illegal agreement that set the minimum price that insurance carriers would bid for Plaintiffs' excess casualty, general liability, auto liability, property, boiler and machinery, flood, homeowner's, crime, foreign g/l, fine arts and terrorism policies coverage.  The bid rigging agreement artificially inflated Chubb's and the other Insurer Defendants' bids and thereby fixed and inflated the price that Plaintiffs paid for insurance coverage.

64.     As a direct and proximate result of the agreement in restraint of trade, Plaintiffs suffered injury to their business and property.

**Count 2: Unreasonable Restraint of Trade in Violation of Sherman Act § 1 (All Defendants)**

65.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

66.     The activities of Marsh and the Insurer Defendants that participated in the bid rigging scheme as described in this Complaint are within the flow of, and substantially affected, interstate commerce.

67.     For each insurance product, the sale of excess casualty, general liability, auto liability, property, boiler and machinery, flood, homeowner's, crime, foreign g/l, fine arts, and terrorism insurance are the respective relevant product markets.  The relevant geographic market in which Marsh's antitrust violation occurred is the United States.  Other insurance products or risk management products are not reasonably interchangeable with or economic substitutes for each type of insurance sold in the United States.  They would not substitute for other products in response to an appreciable and lasting price increase imposed by insurers with market power.

68.     Chubb and other insurance carriers that participated in the scheme are leading competitors in the relevant market and collectively have market power.  Together they account

for a substantial share of the sales of insurance coverage in each relevant product market and have the ability to restrain trade to the detriment of consumers.

69.     Marsh orchestrated and supervised a scheme among competing insurers to engage in bid rigging.  Marsh and the participating Insurer Defendants agreed to fix the price that Plaintiffs and other consumers paid for insurance coverage.

70.     Consumers in the relevant market suffered harm as a direct result of the bid rigging agreements described in the Complaint.  The bid rigging agreements injured competition in the respective markets for excess casualty, general liability, auto liability, property, boiler and machinery, flood, homeowner's, crime, foreign g/l, fine arts, and terrorism insurance by artificially inflating the price consumers paid for insurance coverage.

71.     As a direct and proximate result of an agreement in restraint of trade, Plaintiffs suffered injury to their business and property.

**Count 3: Fraudulent Misrepresentation (Marsh)**

72.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

73.     Marsh and Plaintiffs had a relationship of trust in which Marsh had a responsibility to communicate accurate information.

74.     Marsh intentionally misrepresented material facts to Plaintiffs and concealed material facts from Plaintiffs.

75.     Marsh knew that the facts it misrepresented and concealed were false and that Plaintiffs would rely upon them.

76.     Plaintiffs reasonably relied on Marsh's misrepresentations and omissions and suffered harm as a result.

**Count 4: Negligent Misrepresentation (Marsh)**

77.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

78.     Marsh and Plaintiffs had a relationship of trust in which Marsh had a responsibility to communicate accurate information.

79.     Marsh negligently misrepresented material facts to Plaintiffs and concealed material facts from Plaintiffs.

80.     Plaintiffs reasonably relied on Marsh's misrepresentations and omissions and suffered harm as a result.

### Count 5: Negligence (Marsh)

81.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

82.     As Plaintiffs' insurance broker, Marsh failed to exercise reasonable diligence and perform with the skill or care ordinarily possessed by companies acting in its capacity.  As a result of Marsh's negligence, Plaintiffs suffered harm.

### Count 6: Breach of Fiduciary Duty (Marsh)

83.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

84.     Marsh and Plaintiffs had a fiduciary relationship in which Marsh had a responsibility to provide services and advice for the benefit of Plaintiffs.

85.     Marsh intentionally breached its fiduciary duty and Plaintiffs suffered harm as a result.

### Count 7: Tortious Interference with Prospective Business Relations (Marsh)

86.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

87.     Plaintiffs had a reasonable expectation of entering into a valid business relationship with a competitive insurance carrier upon submission of a competitive bid.  With knowledge and understanding of Plaintiffs' expectation, Marsh wrongfully interfered with Plaintiffs' prospective business relations.  Marsh interfered by engaging in wrongful acts that it knew would harm Plaintiffs.  As a result of Marsh's interference, Plaintiffs suffered harm.

## Count 8: Deceptive Business Practices (Marsh)

88.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

89.     Marsh served as a broker of plaintiffs' policies through its Global Broking department in New York.

90.     Plaintiffs acted as a consumer for purposes of their purchase of insurance broking services through Marsh.

91.     In soliciting artificially inflated bids from competing insurers, Marsh employed deceptive acts and practices.  Marsh intended to induce Plaintiffs to rely upon Marsh's misrepresentations concerning the competitive environment in which the bids were received.

92.     Marsh's conduct violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*

93.     Plaintiffs were injured as a result of Marsh's violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

94.     A finding of liability would serve the interests of consumers by creating disincentives for insurance brokers to deceive their clients and to conceal material facts concerning insurance.

## Count 9: Deceptive Business Practices (Marsh)

95.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

96.     Marsh served as a broker of plaintiffs' policies through its Global Broking department in New York.

97.     Plaintiffs acted as a consumer for purposes of their purchase of insurance broking services through Marsh.

98.     In soliciting artificially inflated bids from competing insurers, Marsh employed deceptive acts and practices.  Marsh intended to induce Plaintiffs to rely upon Marsh's misrepresentations concerning the competitive environment in which the bids were received.

99.     Marsh's conduct violated New York General Business Law Section 349.

100.     Plaintiffs were injured as a result of Marsh's violation of the New York General Business Law Section 349.

101.     A finding of liability would serve the interests of consumers by creating disincentives for insurance brokers to deceive their clients and to conceal material facts concerning insurance.

### Count 10: Breach of Contract (Marsh)

102.     Plaintiffs repeat the allegations made in the preceding paragraphs as if fully set forth herein.

103.     Marsh and Plaintiffs entered into contracts.

104.     Plaintiffs performed their conditions of the contracts.

105.     Marsh breached the contracts by failing to provide proper advice to assist Plaintiffs in managing insurance costs; by failing to represent the interests of Plaintiffs rather than the insurers; by failing to recommend, negotiate, and implement cost-effective insurance; by failing to negotiate on Plaintiffs' behalf; by failing to keep Plaintiffs informed of significant developments; by failing to use its best efforts to place insurance on behalf of Plaintiffs.

106.     As a result of Marsh's obvious and flagrant breaches, Plaintiffs suffered harm.

### PRAYER FOR RELIEF

Plaintiffs ask the Court to grant the following:

A.     Treble damages and attorneys' fees as remedies for Defendants' violations of the Sherman Act;

B.     Forfeiture of compensation retained by Marsh; restitution of payments received from Plaintiffs; damages caused by Defendants' conduct; punitive damages owing to the malicious, willful, and wanton nature of Defendants' conduct; prejudgment interest; and attorneys' fees as remedies for Defendants' violations of state law; and

C.     All other relief that the Court deems just and proper.

## JURY TRIAL

Plaintiffs demand a trial by jury.


Dated: May 21, 2007

Respectfully submitted,


   s/ James G. McCarney
_____
James G. McCarney
Howrey LLP
Citigroup Center
153 East 53rd Street, 54th Floor
New York, New York  10022
(212) 896-6500

Ernest Summers III
David Emanuelson
Howrey LLP
321 North Clark Street, Suite 3400
Chicago, Illinois 60610
(312) 595-1239

Michael G. Cowie
Howrey LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 783-0800

Attorneys for Plaintiffs Henley Management
Company, Big Bear Properties, Inc., Northbrook
Properties, Inc., RCK Properties, Inc., Kitchens,
Inc., Aberfeldy, LP, and Payroll & Insurance
Group, Inc.